MARY G. RICKS *v.* UNITED STATES (No. 4469) [1]

United States Court of Customs and Patent Appeals, May 24, 1945

*Lawrence A. Harper* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

[Oral argument April 11, 1945, by Mr. Donohue; submitted on brief by appellant]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The Collector of Customs at the port of San Diego, Calif., in the year 1940, classified the involved merchandise (invoiced as barley bran), exported from Mexico, under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article and assessed the same with duty at 20 per centum ad valorem. The importer protested the said classification and assessment of duty, claiming in her original protest that the merchandise was dutiable at 5 per centum ad valorem under paragraph 730 of said tariff act as modified by the trade agreement with Canada, T. D. 49752, as "by-product feeds obtained in milling wheat or other cereals," and by amended protest, at 7½ per centum ad valorem under paragraph 1555 of said act as modified by said trade agreement and also the trade agreement with the United Kingdom, T. D. 49753, as "Waste, not specially provided for."

The United States Customs Court, Third Division, overruled the said protest, and from its judgment the importer has here appealed.

Paragraphs 730 and 1555 of the Tariff Act of 1930, as modified by the said trade agreements with Canada and the United Kingdom, read as follows:

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 730 | Bran, shorts, by-product feeds obtained in milling wheat or other cereals__ | 5% ad val. |
| 730 | Hulls of oats, barley, buckwheat, or other grains, ground or unground____ | 5¢ per 100 lbs. |
| 730 | Dried beet pulp____ | $3.75 per ton. |
| 730 | Malt sprouts and brewers' grains____ | $2.50 per ton. |
| 730 | Mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs. | 5% ad val. |
| | *          *          *          *          * | |
| 1555 | Waste, not specially provided for____ | 7½% ad val. |

The imported merchandise is a product made from the manipulation of barley in the production of malt which is used in the making of beer. The imported product, which is used in this country to feed cattle, is produced in the malt-making operation in the following manner: The barley, after it is received from the field, is elevated to the top of the work tower in the malt-producing plant of the Compania Mexicana de Malta, S. A., located at Tecate, Mexico. At the top of the tower it is deposited in a bin, and from there it passes by gravity through a series of machines which separate and remove certain components of the barley which are not wanted in the manufacture of the main product—malt. These components comprise beards, awns, foreign seeds such as wheat, broken grains, straw, etc. The barley which has been screened and cleaned as aforesaid is then put into a tank of water, where it remains until it has absorbed about 46 per centum of water. It is next placed in germinating drums, where it remains 6 days; and germination is then stopped and the moisture is drawn off by hot air, leaving barley malt with sprouts attached. Next the malt is elevated to the top of the tower, from which it works down by gravity through the debearder and the malt cleaner, and the sprouts and screenings are removed, making the malt ready for sale to brewers. The malt is not ground in the plant, but is ground by the malt users. Malt of this character is specially provided for in the tariff act, and we are not here concerned with that product. Malt sprouts are also specifically provided for.

In the separating processes, pieces of straw, foreign seeds, wheat, and broken kernels are separated by various kinds of machinery; and they, together with the sprouts—in other words, all except the malted grains with some hull, much of which has been removed—are collected and run through a hammer mill, where the mass is beaten to a fine consistency. It is in that condition that the involved merchandise is imported into this country and sold as barley bran.

Agreeably to the holding of the court below, it is the contention of the Government that the involved merchandise is not properly dutiable under the provision for "Bran, shorts, by-product feeds obtained in milling wheat or other cereals" for the reason that, although a byproduct of a cereal (barley), it is not obtained in "milling"; and that it is not dutiable as "Waste, not specially provided for" because it is more than a waste—a manufactured product.

Appellant here makes the contention that the merchandise is concededly a byproduct of barley (this fact does not seem to be disputed by anyone); that it is produced in the milling of a cereal, to wit, barley; and that it therefore comes directly within the first provision of said paragraph 730. Appellant urges, and cites certain authorities as supporting her contention, that the screening, separating, debearding, and removal of the awns and brewers' sprouts are all to be regarded

as a part of the complete milling operation; that some of these processes, for instance, screening, separating, and mixing are necessary steps in the milling of wheat to make flour; and that therefore, while the grain has not been crushed or ground in the milling operation, it is nevertheless, notwithstanding the malting process, the result of milling operations.

We find ourselves in agreement with the trial court in its holding that the imported merchandise is not a byproduct feed obtained in the milling of wheat or other cereals, such as is provided for in the provision now under discussion. Even if it were assumed that the screening, separating, and mixing of grain such as barley are steps in a milling operation, it is obvious that the merchandise is obtained only in part by such operations. Screening and separating grains from undesired constituents are processes frequently performed without any relevancy to the milling of cereals, as the term "milling" is commonly understood. The same is true of mixing.

It is noted from the exhibit representing the finished malted product introduced in evidence that a portion of the husk and the outer skin of the grain remains. The finished product has an appearance similar to oats in the hull. In the milling of wheat, the thin skin, somewhat brown in color, on the outside of the grain is removed by cracking and sifting the skin away from the other ingredients. The portions removed, when so sifted, are known as wheat bran. In the instant finished malted product, which, as before stated, is subsequently ground by the consumer, the so-called inner skin comparable to the wheat skin has not been removed; and the imported product does not contain any portion of that part of the barley malt which is comparable to the bran from wheat. It, of course, does contain a small quantity of bran which comes from some of the foreign seeds and from wheat and broken grains. In appearance and characteristics it does not resemble bran, although it is frequently called "barley bran."

It seems to be conceded that the imported feed material is a byproduct of the manipulation of barley. Just why Congress very specifically limited the controverted provision to "by-product feeds obtained in *milling* wheat or other cereals" [italics not quoted] is not clear, but it is sufficient to say that Congress provided for a duty of 10 per centum ad valorem on such byproduct feeds as well as on mixed feeds, which will be hereinafter discussed, and made separate provision for each. It could readily have said, in lieu of the language used, "by-product feeds obtained from wheat or other cereals"; but for some reason it saw fit to say "obtained in milling wheat or other cereals." It will be noted that the only examples given in the controverted provision for byproduct feeds are "Bran" and "shorts," both of which are obtained from a cereal after the same has been ground.

The common definition of the term "mill" in Webster's New International Dictionary is as follows:

*mill*—v. t. * * * (b) To reduce to fine particles, or to small pieces, in a mill; to grind; comminute; powder.

v. i. 1. To undergo hulling.

In Funk & Wagnalls New Standard Dictionary we find the following:

*mill* * * * 8. To convert (grain) into flour by grinding. 9. To remove the hulls or husks from (seeds), as in a mill.

In the Encyclopaedia Britannica the word "mill" is defined as follows:

MILL, the term given to the apparatus used in the grinding of corn into flour, and hence applied to similar 'mechanical devices for grinding or pulping other substances; *e. g.*, coffee-mill, powder-mill. * * *

The importer introduced the testimony of certain witnesses relating to the question as to what steps in the manipulation of grain were regarded as milling, and there is testimony in the record to the effect that the witnesses did not disagree with the common definition from the dictionary, but stated that the definition was too narrow and should be broadened to include the byproducts from any machinery used in performing operations upon cereals. No attempt, however, was made to prove a commercial meaning of the terms "mill" or "milling" different from the common meanings as defined in the dictionaries and other authorities. Of course, the word "mill" is broad enough to include steel mills, saw mills, and various other kinds of mills for the manipulation and milling of various kinds of objects, but here we are concerned only with the milling of cereals, and we are of the opinion that since the instant merchandise is a product of a malt-producing process, it is not the product of a cereal-milling process.

Appellant has called attention to the fact that Congress, in the Tariff Act of 1930, in more than one instance has used the terms "milling" or "milled." For instance, "milled rice" is provided for in paragraph 727 of the Tariff Act of 1930. Following the provision for milled rice is the term "(bran removed, all or in part)." Some kind of mill removes the outer skin or jacket of the rice, leaving the white, clean kernel. That was not done in the instant case. Paragraph 732 provides for "Cereal breakfast foods * * * processed further than milling." Corn flakes and shredded wheat are examples of this kind of goods. See Summary of Tariff Information, 1921, page 707. They are processed beyond milling, but evidently the cereals had been milled prior to such processing. In the instant case the kernel or germinating part of the barley was not removed by a milling operation but by a process involving germination, followed by the drying and sprout-removal steps. The kernel of wheat is removed after the grain is crushed or ground.

We therefore hold that appellant's protest claim that the merchandise is dutiable under the first clause of said paragraph 730 as a byproduct feed obtained in the milling of a cereal was properly overruled.

We think the trial court also properly held that since the merchandise is a manufactured byproduct, it is not "Waste, not specially provided for," under paragraph 1555. See *United States* v. *Geo. S. Bush & Co. (Inc.) et al.,* 16 Ct. Cust. Appls. 406, T. D. 43131.

Appellant strenuously argues that if the merchandise is not dutiable under either the first clause of paragraph 730 or paragraph 1555, it should be held dutiable under the first clause of paragraph 730 by similitude. She argues, in substance, that it is similar in material, since it is a byproduct feed; similar in quality, since it contains nothing but the byproducts of cereal (barley); similar in texture, since it consists of a mixture of the ingredients hereinbefore stated; and similar in use, since it is sold for animal feed purposes and for no other use.

In this court appellant assigned as error the failure of the trial court to consider the dutiability of the importations under the "mixed feeds" provision of paragraph 730 and its failure to hold the merchandise so dutiable, although there was no such claim in the protest. Assignment of error was also made against the court's failure to hold the merchandise dutiable as "mixed feeds" by similitude. In her brief, however, appellant has made no mention of those assignments and has not argued those issues, apparently for the reason that if the importation is a byproduct obtained from barley, it is not that product mixed with "oil cake, oil-cake meal, molasses, or other feedstuffs."

The similitude provision of the tariff act, in substantially its present form, has found its way into every tariff act for more than 100 years, and on many occasions courts have been called upon to consider its applicability in the classification of merchandise. This court, at various times, has considered the meaning of the term "similar, either in material, quality, texture, or the use to which it may be applied." Probably the fullest expression by this court as to the meaning of this term is to be found in the case of *Pittsburgh Plate Glass Co.* v. *United States,* 2 Ct. Cust. Appls. 389, T. D. 32162, wherein it was held that mats of unwoven hair were dutiable by similitude under the provision for "unwoven felt in part of wool" in paragraph 382 of the tariff act of 1909. The court held that the imported merchandise contained no wool, but that its use controlled its classification under the similitude provision. In discussing the above-quoted phrase, after holding that the material was used solely in connection with plate glass manufacture as were the comparable woolen articles directly provided for under

the term "felt in part of wool," the court stated, in substance, that in considering similitude of use the question as to what *effect* similar uses might have when the two articles were compared was important. It quoted from *Pickhardt* v. *Merritt*, 132 U. S. 252, the following:

* * * the mere application to the dyeing of fabrics would not create the similitude, but * * * if there was a similitude in the mode of use, a similitude in the same kind of dyeing, producing the same colors in substantially the same way, so as to take the place of aniline dyes in use, there would be a similitude in use * * *.

It also quoted from *Murphy* v. *Arnson*, 96 U. S. 131, relating to similitude of use, the statement that similitude "plainly refers to its employment, or its effect in producing results." Also cited were *Patterson* v. *United States*, 166 Fed. 733; *Arthur* v. *Fox*, 108 U. S. 125; and *Rosenstern* v. *United States*, 171 Fed. 71.

It has been so often held as to require no citation of authority here that similitude is a question of fact and is to be proved. The similarity in use between certain things may be so obvious as to require no express proof, and, in considering similitude, proper deductions from proven facts may be indulged.

But we know of no holding in cases like the instant one that it is sufficient to prove that the material is used for feeding cattle. While appellant, in her brief, makes one statement to the effect that the testimony shows that the material was sold for feedstuffs and for no other purpose and was fed to farm animals in its imported condition, we find no definite support in the record for the contention that it discloses that the merchandise is fed to farm animals in its imported condition. However, even if this could be spelled out from the record, it would not affect our conclusion. It is not sufficient proof of similitude of use, as applicable to the issue involved here, to show that the merchandise is used for and sold as an animal feed or as feed for cattle, in its imported condition. It was held in *C. J. Tower & Sons* v. *United States*, 25 C. C. P. A. (Customs) 408, T. D. 49486, that merely because the imported merchandise there involved was used as a food for animals was not sufficient proof of similitude of use. See also *Corporacion Argentina de Productores de Carnes* v. *United States*, 29 C. C. P. A. (Customs) 288, 297, C. A. D. 204. It has been pointed out frequently that hay is food for animals, but its use is not similar to that of cereals. It is true that to be similar, it does not necessarily have to contain all the same ingredients or have exactly the same effect upon the animal; but its effect should be similar, because prepared feeds are frequently used and fed for different purposes and with wholly different results.

Appellant has not here sought to prove that the instant merchandise, consisting of a mixture of the various undesirable portions of

barley not needed for malt purposes, took the place of such by-product feeds as are provided for in paragraph 730, or that the feeding results are similar to those of such feeds, or, for that matter, to those of mixed feeds. The *Pittsburgh Plate Glass* case, *supra*, and the cases therein cited, together with the *Corporacion Argentina* case, *supra*, and the *Tower* case, *supra*, are abundant authority for holding that in the case of feedstuffs or mixed feeds, where similitude is to be proved, it is not sufficient merely to show that the imported merchandise is used for cattle or animal feed, as are some of the articles provided for in paragraph 730.

A case which indicates the necessity for proof on this subject is a recent decision by this court, *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 C. C. P. A. (Customs) 175, C. A. D. 304 (decided March 5, 1945, Appeal No. 4483). There the importer proved the exact contents of its imported dog-food mixture, containing 5.8 per centum cereal, the amount and effect of which were in dispute, and also proved that it was used as a complete dog food, not merely as an auxiliary food for certain purposes, and many other facts relating to its use to show that the use was similar to that of the articles provided for in the statute.

So, upon the foregoing considerations, we are of the opinion that the record fails to disclose sufficient facts to warrant this court in reversing the trial court on this issue and holding that there is sufficient similitude of use between the involved merchandise and those articles which are provided for in the controverted byproduct-feeds provision.

As to appellant's assignment of error with respect to the failure of the trial court to hold that the merchandise was dutiable by similitude to the mixed-feeds provision of paragraph 730, under which there was no claim for direct classification, it would seem obvious that if appellant has failed in her proof in respect to which we have already adverted, she has also failed to prove similarity of use with respect to the mixed-feeds provision.

This leaves for our consideration the question as to whether or not appellant's merchandise should be regarded as sufficiently similar to those articles provided for in the controverted provision in *material*, *texture*, or *quality*. The fullest discussion of this subject we know of is to be found in the case of *Ringk & Co.* v. *United States*, 13 Ct. Cust. Appls. 126, T. D. 40960. There, in an opinion by Judge Barber, long strips of cellophane were compared, for purposes of determining similitude, with manufactures of gelatin, which might be in strips. It was there said:

It is not exactly clear to us from the Government's argument whether it relies upon similitude other than that of use. But however that may be, we proceed to examine the evidence relating to the four classes of similitude mentioned in paragraph 386.

As to material, it is sufficient to say that gelatin is an animal product while cellophane is of vegetable origin. No reason is suggested for holding that under the circumstances of this case similitude of material is present. See in this connection *Cone* v. *United States, supra.* [6 Ct. Cust. Appls. 263, T. D. 35477.]

As to similitude of texture, we doubt if any is present in this case and do not understand the Government to so claim. No direct testimony tended to establish such similitude between gelatin and cellophane in any condition.

The derivation and meaning of the word "texture" indicates that it would naturally be more applicable to woven fabrics or textile fibers than to gelatin or cellophane. In this connection see *Pickhardt* v. *Merritt*, 132 U. S. 252 at 258; *Stratton* v. *Komada & Co.*, 148 Fed. 125; *United States* v. *Komada & Co.*, 162 Fed. 465.

As to similitude of quality, the uncontroverted evidence definitely shows the following: Cellophane will wrap more closely when used as a wrapper than will gelatin and can be used for a wet wrapper, while gelatin can not. Gelatin is soluble in water, grease, or alcohol; cellophane is not. Gelatin will crack much more easily than cellophane. Gelatin can not be embossed; cellophane can. Gelatin will not stretch; cellophane will. Cellophane in strips or sheets can be dyed; gelatin in those forms can not. Gelatin can not be sewed; cellophane can.

These differing qualities appeared from testimony given by the witness called by the Government.

The witnesses for the importers testified in effect to the same differences in qualities. In addition they said that cellophane has a tensile strength and is tough, while gelatin is deficient in both these respects; that cellophane can be sterilized in boiling water while gelatin will disappear when immersed therein; that gelatin, under certain atmospheric conditions, will develop an objectionable odor; that cellophane has little or no odor, if any, an agreeable one.

We are unable to find any testimony in the record that shows any substantial similitude in quality between these cellophane strips and any manufacture of gelatin.

It will be observed that in that case there was a vast difference in the material of the articles compared—probably much more than exists in the instant case. There is no proof, however, in the instant record to show in what way the material of the instant importation is similar to the material covered by the phrases "by-product feeds obtained in milling wheat or other cereals" or "mixed feeds." It is obvious that in material, the instant merchandise differs from those specifically named in paragraph 730—"Bran" and "shorts."

As to texture, appellant urges that there is substantial similitude. For reasons stated under the discussion of material, there is no proof of this fact. But, even if it be assumed that the articles provided for in the statute have, in some instances, the appearance of ground chaff, straw, etc., mixed with a floury substance, as does the imported merchandise, this fact would not control classification. Wheat flour is similar in texture to slaked lime, but no one would think of arguing that such a similarity of texture (if "texture" refers to this kind of characteristic) should be controlling of classification in that instance. We think this court in the *Ringk* case, *supra*, properly evaluated the

effect of the provision with reference to texture in the similitude paragraph, and that it is a matter of small consequence when applied to goods like those at bar.

As to quality, we have no way of knowing from the instant record, from common knowledge, or from facts of which we may take judicial notice, or otherwise, the similarity of the quality of the instant merchandise to that of those articles which are provided for in the so-called feed paragraph. It will be noted that in the *Ringk* case the word "quality" was apparently regarded as referring to certain characteristics, such as the fact that gelatin was soluble in water, grease, or alcohol, while cellophane was not. It is doubtful as to whether this was all that Congress meant by the word "quality," but certainly the qualities, if measured by the suggestion in the *Ringk* case, have not been shown in the instant record. It may be observed here that in the *Tower* case, *supra*, in discussing quality, relating to feedstuffs, this court stated:

Clearly, the quality of the imported merchandise is not similar to that of bran, shorts, and the other articles named in the paragraph. It would seem to be of *higher* quality. [Italics not quoted.]

It is not illogical to conclude that in using the term "quality," Congress had in mind, at least in part, the fact that some goods might be of a low quality, that is to say, poorly and cheaply constructed, limited in usefulness, etc., as against goods of high quality, of superior workmanship, and possessed of more desirable qualities. At any rate, and regardless of whatever may be said of the meaning of the word "quality" as used in the similitude paragraph, we are certain that the record here affords no basis for holding the goods of the importer dutiable under either of the feed provisions by virtue of the similarity in quality.

It might here appropriately be added that the term "quality" used by Congress is one which would seldom be given effect by itself alone to control the classification of merchandise. Surely, if there were similarity only in *quality* and no similarity in other respects, it would be difficult to see how quality alone could be controlling in very many instances. However, the word has been employed by Congress in many different tariff enactments, in substantially its same relationship to the other words used, and we are not privileged, without trespassing on the legislative province, to ignore its presence and applicability in the decision of the instant issue.

In view of the fact that the imported merchandise is concededly a byproduct of barley and is used for feeding animals, it may seem highly technical to hold that it is not dutiable, directly or by similitude, under one or the other of the feed provisions; but under the circumstances at bar we find no reason for ignoring the very definite

provision for "by-product feeds obtained in milling wheat or other cereals," and in adopting as controlling here, one of the broader meanings of the word "milling" which, as hereinbefore suggested, might be applied in the manipulation of materials other than that at bar. Moreover, the similitude provision of the statue is a wholesome one to be applied by the courts for the purpose of carrying out the legislative will with respect to determining the dutiable classification of imported nonenumerated merchandise. Throughout the years, definite holdings with respect to its interpretation and application have been agreed upon by the courts. To depart from such holdings, even though we were convinced that a more equitable result would be obtained thereby, would inevitably lead to such confusion and uncertainty as to greatly lessen the value of the provision. If the instant merchandise bears a similitude to the articles covered by the controverted paragraph greater than is shown by the record here, there is no reason why it could not be shown by proper proof.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *affirmed*.